FITCHBURG SAVINGS BANK *vs.* MASSACHUSETTS BONDING AND INSURANCE COMPANY.

Worcester.    November 5, 1930. — January 7, 1931.

Present: PIERCE, CARROLL, WAIT, & FIELD, JJ.

*Bond,* Of indemnity. *Savings Bank. Estoppel. Waiver. Words,* "Loss," "Full particulars."

A "bankers' blanket bond" of indemnity against loss "due to any dishonest or criminal act on the part of any of the officers or employees of the Insured" or against loss "through any other form or fraud or dishonesty by any person or persons, whether employees of the Insured or not" made effectual to a savings bank to which it was issued insurance against loss sustained by it through diversion of its funds by its treasurer for his own benefit by means of loans made to irresponsible persons without security in violation of G. L. c. 168, § 29, and of § 53A, added to G. L. c. 266 by St. 1922, c. 313, § 2.

Such a bond contained the following provisions: "At the earliest practicable moment, and at all events not later than ten days, after the Insured shall discover any loss hereunder, the Insured shall give the Underwriter notice thereof by registered letter or telegram, addressed to it at its home office, and shall also, within three months after such discovery, furnish to the Underwriter at its home office affirmative proof of loss with full particulars. Legal proceedings for recovery of loss hereunder shall not be brought prior to the expiration of three months from the furnishing of such proof, nor after the expiration of twelve months from the discovery of such loss." ". . . the Underwriter upon payment of any loss hereunder shall become subrogated to all the rights and remedies of the Insured in respect of such loss." *Held,* that

(1) The word "loss" in the bond meant the deprivation or dis-possession of money or property of the bank due to the dishonest, criminal or fraudulent acts of its officers, regardless of the security the bank had for the loss;

(2) The insured could maintain an action for such loss against the insurer without proof that it first had exhausted remedies which it had against the treasurer and indorsers upon the notes he fraudu-lently used;

(3) Such action could be maintained without proof that, at the time the action was begun, it had sustained some actual defined loss, not merely nominal, as the result of the transaction in question.

The savings bank insured by the bond above described discovered the fraud of its treasurer on November 10, and on that day and on No-vember 18 sent unregistered letters to the insurer stating in substance that loss might result to it from loans made by the treasurer for his own benefit if there was a loss on paper of others used by him for that purpose, and that, if- such loss occurred, it would look to the insurer upon the bond. In reply to the letters, the insurer merely asked for further information and made no complaint of any defect in the notice sent and did not raise the question of its validity as a notice because it was not registered or in the form of a telegram. In an action by the insured against the insurer upon the bond, it was *held*, that the defendant was estopped from setting up as a defence the defective form of the notice.

In the three months, within which, by the provisions of the bond above described, the insured was required to furnish the insurer "at its home office affirmative proof of loss with full particulars," there was correspondence between the parties in which the insured stated in substance that a loss might occur on the notes in question; and in an interview with a representative of the insurer at the insured's place of business the notes were shown to him. At the trial of the action on the bond, it appeared that there were in the books of the trust company or in the knowledge of its officers material facts re-lating to the treasurer's transactions which were not stated to the insurer in any form within three months after his unlawful acts were discovered. *Held*, that the evidence, documentary and oral, would not warrant a finding that the plaintiff furnished the "affirmative proof of loss with full particulars" required by the provision of the bond within the specified three months.

Before the expiration of such three months' period, the president of the plaintiff had an interview with a representative of the defendant at the defendant's office, in which the defendant's representative stated as the ground for its refusal to recognize liability on the bond a con-struction of a part of its language which had nothing to do with the requirements as to notice and as to the furnishing of "full par-ticulars" within three months of discovery of the fraud of the treas-urer. Eight days later, and nineteen days before the expiration of the three months' period, the defendant wrote to the plaintiff, stating, "You are, of course, in possession of all the facts surround-ing this matter. As surety on this bond we are entitled to what-

ever information you have that in any way affects this bond. . . . Whatever the information, whatever the facts in your possession, it is your duty and the duty of the bank frankly and fully to furnish them to this Company." There was no evidence of an express waiver of the condition precedent by the defendant after the three months' period had elapsed, nor any evidence that after that period the plaintiff abandoned any right or changed its position to its prejudice in reliance upon any statement or conduct of the defendant or of its representatives. *Held*, that the contents of such letter to the plaintiff prevented the plaintiff's relying on the previous oral statement of the defendant's representative, and the defendant was not estopped to rely on the provision of the bond requiring the plaintiff to furnish "full particulars" in three months after discovery of loss under the bond.

At the trial of the action above described, the judge admitted in evidence the interview with the defendant's representative at its office for all purposes except on the question of waiver of the provisions of the bond as to the furnishing by the plaintiff of "full particulars" within three months; and, at the close of the evidence, ordered a verdict for the defendant and reported the action to this court. Having determined that the statement of the defendant's representative, made twenty-seven days before the expiration of the three months' period and followed eight days later by the defendant's letter stating that it was entitled to full particulars, did not estop the defendant from relying on such provision of the bond, this court *held*, that

(1) There was no reversible error in the limiting of the use of evidence as to the interview with the defendant's representative;

(2) It was proper to order a verdict for the defendant.

CONTRACT upon an indemnity bond described in the opinion. Writ dated October 25, 1927.

In the Superior Court, the action was tried before *Thayer, J.*

The letter of the plaintiff to the defendant dated November 10, 1925, referred to in the opinion, read as follows:

"For your information we would say that the resignation of the Treasurer of this Bank, Frederic C. Nichols, has been presented and at a special meeting of the Trustees held yesterday was accepted. Although Mr. Nichols appears to be heavily indebted personally to institutions outside of Fitchburg and to certain individuals, we have no information that leads us to believe that this Bank is in any way involved by his management of his personal affairs.

"Mr. Nichols was given leave of absence by the Board

of Investment of the Bank on Monday, November 2d, and has not been in the Bank or acted as Treasurer since that date.

"As examination by the Commissioner of Banks, and *on Saturday last* by our own Auditors, shows the assets and securities and cash of the Bank intact, and that Mr. Nichols is not indebted to the Bank. Consequently we have no expectation of loss to the Bank arising out of his acts as Treasurer which would necessitate formal notice to you under Section 9 of the Blanket Bond #F-128497 which this Bank holds from your Company; but we feel that you should receive this *information* from us.

"We enclose herewith copies of the statement of the Commissioner of Banks and of our Trustees, and under separate cover Fitchburg Sentinel of the 9th inst.

"Please acknowledge receipt hereof."

To the above letter, the defendant replied as follows:

"*Re:* Frederick C. Nichols. We wish to acknowledge your letter of November 10th, with enclosures from which we note that the resignation of Frederick C. Nichols, Treasurer of your bank, has been accepted, and that an examination by the Commissioner of Banks, and by your own Auditors discloses the fact that the assets, securities and cash of the bank are intact. We hope that your bank will not be injured by this unfortunate occurrence."

On November 18, 1925, the plaintiff, by its president, wrote the defendant as follows:

"Referring to my letter to you of November 10th (acknowledgment of which, by the way, I have not yet received, as requested), I have a criticism from the Commissioner of Banks of the third paragraph of my letter, for the reason that the Bank holds two notes which the Commissioner is satisfied were for the benefit of Mr. Nichols; and that should the makers fail to pay them upon maturity, they would result in a loss to the Bank for which it would look to you on your Blanket Bond. I write this for your further information and to prevent any misunderstanding should the Bank suffer loss on either or both of these notes. Kindly acknowledge receipt of *both* of my letters."

The defendant replied by the following letter dated November 19, 1925:

"We have your letter of November 18th and it appears you have not received our letter to you of November 12th, of which a copy is enclosed. Acknowledgment is made of your further advices that the bank holds two notes which the Commissioner feels were for the benefit of Mr. Nichols, and should the makers fail to pay, the bank may sustain a loss. Will you give us just a little further information regarding these notes, especially as to the names of the makers, amounts and dates of maturity, and how secured."

On November 20, 1925, the plaintiff by its president wrote the defendant as follows:

"Acknowledging receipt of yours of the 19th inst. I would say that I did you an injustice in saying that your reply to mine of the 10th inst. had not been received. It came duly, but was filed away without my seeing it.

"In answer to your question I can give you the information you ask for, but we must ask you to regard it as *confidential.*

"We hold a note dated October 8th, 1925, for $50,000.00, signed by Mary I. Gardiner as principal, and Edward J. Finlay, J. Scott McLearn, and Puritan Real Estate Trust — J. Scott McLearn Trustee — as sureties, payable on demand.

"Also a note dated October 10th, 1925, for $20,000.00 signed by Lincoln R. Welch as principal, and Ralph H. Westgate and Mary C. Welch as sureties, payable on demand. Neither of these notes have any collateral."

On January 11, 1926, the plaintiff by its president wrote the defendant as follows:

"Referring to the above matter and to my previous letters to you of November 18th and 20th respectively I would say, with reference to the $20,000. note signed by Lincoln R. Welch as principal and Ralph H. Westgate and Mary C. Welch as sureties, we may stand to lose a matter of $15,000., as all we can see a prospect of getting now is $5,000. In such case we should look to you for the difference."

Testimony of the president as to a conversation he had with one Sullivan, representing the defendant, on January 14, 1926, was admitted for all purposes except "for the purposes of proving a waiver." The president testified as follows:

"He [Sullivan] said, 'I want to talk with you about the claim of the Fitchburg Savings Bank against the Massachusetts Bonding Company.' Then turning over some papers on his desk he produced a bond, blank bond, which was just like the bond that the Fitchburg Savings Bank holds against the company, and laying it before me he said, 'What claim do you think you have against the Massachusetts Bonding Company on this bond?' I said, 'What do you mean by that?' He said, 'Do you think that any one else, or do you suspect any one else as mixed up in the Nichols transaction?' And I said, 'No, certainly not.' He then said, 'Will you look at the first page of the bond,' and asked me to read section three, which says, 'Warrant free of all claims,' followed by five or six subsections. . . . 'For any loss resulting from any loan paid by the insured or any person or persons employed by the insured, whether with the authority of the insured or not, unless with fraud or dishonesty on the part of the officers and employees of the insured.' That is where he stopped me. He said, 'You notice the emphasis on the words "officers and employees"?' I said, 'What do you mean?' and he repeated again, 'You notice it says "the officers or employees of the insured"?' I said, 'Do you mean to say that unless some one else of our employees or officers were mixed up with Nichols in this transaction that we couldn't hold your bonding company on this bond?' He says, 'That is what the bond says.' I got up. I said, 'That is foolishness.' He shut up like a clam, and I walked out."

On January 15, 1926, the defendant wrote the plaintiff as follows:

"Please permit us to acknowledge your letter of the 11th of January with reference to the above mentioned matter and also to confirm our conversation with Mr. Ware while at this office on Thursday, January 14th. In view of your

statements previously made and again repeated by Mr. Ware that there has been no act of dishonesty or fraud on the part of any officer or employee of your bank we are unable to see any claim that you might have under this bond."

The plaintiff, by its president, replied on January 16, 1926, with the following letter, addressed to the defendant:

"Attention of the gentleman who answered to the name of Sullivan — with reference to a letter just received under date of the 15th instant signed by M. F. Carney, Atty. I am astounded at the contents of a letter just received under date of January 15th, current, signed by M. F. Carney, Attorney, particularly at the second and last paragraph in that letter, in reply to which I would say that I never made such statement to the gentlemen I met or to any other representative of your Company."

The defendant replied to the above letter by letter dated January 22, 1926, as follows:

"Your letter of the 16th regarding the above matter is herewith acknowledged. If what we said in our communication to you of the 15th is not correct will you be good enough to say in what particular it is not correct. We have frankly made known to you what we understood you to say. You are, of course, in possession of all the facts surrounding this matter. As surety on this bond we are entitled to whatever information you have that in any way affects this bond. If you have a claim against it, it is our duty to consider it and we should be glad to do so. If you have no claim to make it seems to us that you should so advise us. Whatever the information, whatever the facts in your possession, it is your duty and the duty of the bank frankly and fully to furnish them to this Company."

On May 2, 1927, the plaintiff by its president wrote a letter to the defendant as follows:

"At the time of my letters to you of November 10, 1925 and of November 18, 1925 respectively giving you information relative to the resignation of the Treasurer of this Bank, Frederic C. Nichols, we had no expectation of loss

to the Bank arising out of his acts as Treasurer which would necessitate formal notice to you under Section 9 of the blanket bond #F–128497 which this Bank holds from your company, but we felt you should receive the *information* in said letters contained. Since that time, viz: upon the 25th day of April last we discovered that we had suffered a total loss under two certain notes held by this Bank which were exhibited to your Attorney upon his visit to this Bank shortly after the receipt of our letters of above dates, copies of which notes we enclose herewith. We consequently demand of you under the terms of said bond, reimbursement of the losses so sustained, as losses suffered by reason of the acts of said Treasurer."

The defendant replied as follows on May 11, 1927:

"We have for acknowledgment your letter of May 2nd and until we have received from you a complete statement giving us all the facts in connection with this matter, we cannot advise you as to the position of this Company."

The plaintiff then by registered mail wrote the defendant a letter dated May 14, 1927, containing a statement in detail of its claim. To this on May 26, 1927, the defendant replied as follows:

"In reply to your letter of May 14, 1927, and in further reply to your letter of May 2, 1927, making claim for loss due to the failure of makers of two certain promissory notes described therein to pay the same, we beg to advise you that we deny any liability under our bond for the loss claimed by you. In so doing, we do not waive any requirements of the bond, including 'affirmative proof of loss with full particulars', which, under the terms of Section 9, are required to be furnished to this Company within three months after discovery of any loss claimed."

Other material evidence is stated in the opinion. The judge ordered a verdict for the defendant. Such verdict was returned, and the case was reported for determination by this court on the terms stated in the opinion.

*L. E. Green,* (*J. N. Welch* with him,) for the plaintiff.

*J. C. Reilly,* (*J. W. Flood* with him,) for the defendant.

PIERCE, J.   This is an action of contract brought by the
Fitchburg Savings Bank against the Massachusetts Bond-
ing and Insurance Company by a writ dated October 25,
1927, and entered in the Superior Court on December 5,
1927.   The action is founded upon a "bankers' blanket
bond" by the terms of which the defendant undertook
and agreed to hold the plaintiff "harmless and indemni-
fied (subject to the conditions and warranties herein con-
tained) . . . from and against such losses as the In-
sured may sustain . . . subsequent to noon of the date
hereof and while this bond is in force, and discovered prior
to the expiration of twelve months from the termination
of this bond."   Among the losses covered by the contract
were under the heading "Dishonesty" "a. — Pecuniary
Loss due to any dishonest or criminal act on the part of
any of the officers or employees of the Insured including
loss of property due to any dishonest or criminal act on
the part of any of the officers or employees of the Insured,
whether acting independently or in collusion or combina-
tion with any other person or persons"; under the head-
ing "Fraud" "e. — Loss of Property through any other
form or fraud or dishonesty by any person or persons,
whether employees of the Insured or not.   Sec. 3.   War-
ranted free of all claims: . . . e. — For any loss result-
ing from any loan made by the Insured or any person
or persons employed by the Insured (whether with the
authority of the Insured or not) unless with fraud or
dishonesty on the part of the officers or employees of the
Insured."   Section 14 of the contract contains the follow-
ing provision: " . . . This bond shall terminate as to
any officer or employee of the Insured — (a) as soon as the
Insured shall learn of any default hereunder committed
by such officer or employee, or (b) fifteen days after
the receipt by the Insured of a written notice from the
Underwriter of its desire to terminate this bond as to such
officer or employee."   Section 9 reads: "At the earliest
practicable moment, and at all events not later than ten

days, after the Insured shall discover any loss hereunder, the Insured shall give the Underwriter notice thereof by registered letter or telegram, addressed to it at its home office, and shall also, within three months after such discovery, furnish to the Underwriter at its home office affirmative proof of loss with full particulars. Legal proceedings for recovery of loss hereunder shall not be brought prior to the expiration of three months from the furnishing of such proof, nor after the expiration of twelve months from the discovery of such loss. If any limitation embodied in this paragraph is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law."

The plaintiff's declaration in its amended form alleged, in substance, that on or about October 8 and October 10, 1925, it sustained two losses covered by the agreement of indemnity — one of $50,000 and one of $20,000 — both due to the fraud, dishonest and criminal acts of its treasurer, one Frederic C. Nichols; that on or about November 10, 1925, it discovered said losses and " within ten days thereafter it notified the defendant of its discovery by letters sent to the defendant at its home office and [that said letters were] received and acknowledged by the defendant " ; that " within three months . . . the plaintiff furnished the defendant an affirmative proof of such losses with full particulars "; that " the defendant sent its investigators to the plaintiff who talked with representatives of the plaintiff and examined the plaintiff's records "; that " The plaintiff furnished these investigators with all facts concerning said losses known to the plaintiff or which the plaintiff reasonably could have known and all information requested by such investigators "; that " Thereafter the defendant on or about January 15, 1926 denied liability on the sole ground that no fraud, or dishonest or criminal act on the part of said Nichols within the meaning of said bond and instrument had occurred, and did not say, or claim, or deny liability on the ground that affirmative

proof of loss with full particulars had not been furnished "; that thereafter " on May 2, 1927 when the full extent and exact amount of the losses became known to the plaintiff, the plaintiff made a formal demand upon the defendant in the sum of Seventy thousand (70,000) dollars "; that " On May 11, 1927 the defendant acknowledged the plaintiff's demand of May 2 but stated that the defendant was unable to state its position until it received from the plaintiff a complete statement giving all the facts in connection with the matter "; that thereafter " on May 14, 1927 and again on July 22, 1927 the plaintiff furnished the defendant with a complete statement giving all the facts then known to the plaintiff in connection with the matter."   The declaration further alleged " that prior to January 15, 1926 it furnished the defendant with affirmative proof of the losses with full particulars "; " that the defendant waived the provision or condition of said bond and instrument requiring affirmative proof of loss with full particulars "; " that the plaintiff furnished the defendant with the statements of May 2, May 14 and July 22, 1927; and that until May 26, 1927 the defendant never intimated or stated that it would rely on the provision or condition that affirmative proof of loss with full particulars must be furnished within three months of the discovery of any loss but stated that it relied on other defenses to relieve it of liability."

The answer was a general denial.   The case was tried to a jury.   At the close of the plaintiff's evidence the defendant offered no evidence but presented a motion for a directed verdict in its favor.   Before action was taken by the trial judge, it was agreed that if he directed a verdict for the defendant the following stipulations should be entered into, namely: " If a verdict was properly directed for the defendant, then judgment is to be entered on the verdict.   If, however, on all the evidence, or on all the evidence together with such evidence offered by the plaintiff as was improperly excluded, the case should have been submitted to the jury, then judgment is to

be entered for the plaintiff in such sum as the jury would have been warranted in finding on the evidence as to the amount of loss sustained by the plaintiff." Thereafter the judge allowed the defendant's motion, the plaintiff duly excepted, the jury brought in a verdict for the defendant, and the judge reported the case to this court upon the evidence introduced at the trial.

The evidence warranted the finding of the following facts: on October 2, 1925, Frederic C. Nichols, then treasurer of the plaintiff, owed William M. Whitney $50,000. On that date Nichols paid Whitney the debt by two checks of the Fitchburg Mutual Fire Insurance Company (herein called the insurance company), of which Nichols was a director and a member of the executive committee, drawn on that date in that amount on the Fitchburg Bank and Trust Company. These checks were drawn by the cashier of the insurance company upon the instructions of Nichols with the approval of one Lincoln R. Welch, at that time president and treasurer of the insurance company. The transaction was represented by Nichols and Welch to the cashier as a loan to Whitney.

Nichols then needed the money to repay the insurance company. On October 8, 1925, he instructed the teller of the Fitchburg Savings Bank to draw a check payable to the order of one J. Scott McLearn, trustee of the Puritan Real Estate Trust, in the sum of $50,000. Later on the same day he handed the teller a note signed and witnessed, and payable to the order of the plaintiff, but with the rest of the note blank. This note was signed by Mary I. Gardiner as principal, Edward J. Finlay, J. Scott McLearn, and the Puritan Real Estate Trust as sureties. Nichols instructed the teller to fill out the note for $50,000 and the teller did so. This note was entered on the books of the bank as received against the $50,000 check which had previously been made payable to J. Scott McLearn, trustee of the Puritan Real Estate Trust.

On October 8, 1925, Nichols told the cashier of the insurance company that he had a $50,000 check for pay-

ment of the William M. Whitney loan but it was not properly indorsed. At Nichols' direction the cashier made out a deposit slip for $50,000 and accompanied Nichols to the Fitchburg Bank and Trust Company where the insurance company made its usual deposits. Nichols passed a check to the teller in charge, saying McLearn would be in to indorse it, and it was deposited to the account of the insurance company. On October 9 the cashier of the insurance company learned that the deposit had gone through and she then made an entry as of October 8 on her cash book of the repayment of the Whitney loan. Some time between October 15 and November 9, 1925, Nichols instructed the cashier of the insurance company to erase the William M. Whitney entry and substitute the Puritan Real Estate Trust loan, and this was done.

McLearn was dead at the time of the trial. His association with Nichols and his action in connection with the $50,000 note and check were shown at the trial to have been as follows: In the spring of 1925 Nichols asked McLearn to allow him to use a note of his and asked him to get a couple of indorsers; that he wanted to use the note in connection with the purchase of some property. Later, Nichols again approached McLearn with a similar story, and McLearn gave him three notes signed in blank, one of which was subsequently filled in in the amount of $50,000 and negotiated at the plaintiff bank. McLearn indorsed the $50,000 check but received none of the proceeds. Mary I. Gardiner, the maker of the $50,000 note, was McLearn's fiancée and was heavily involved. Finlay was a janitor in McLearn's employ and had no assets other than his automobile and his salary of $40 a week. Nichols got all the proceeds of the note.

On September 25, 1925, Nichols procured a check from the insurance company for $20,000, which he put with the cash of the plaintiff. Had he not done so the cash of the bank for which he was responsible would have been short $20,000. To repay the insurance company, on October 10, 1925, he caused the teller of the plaintiff bank to

draw a check for $20,000, payable to the insurance company, and he used this check to repay the $20,000 he owed the insurance company.  Later on the same day the teller of the plaintiff bank received a note for $20,000 signed by Lincoln R. Welch, president of the insurance company, with Mary C. Welch and Ralph H. Westgate as sureties. This note was put in the plaintiff's papers to balance the $20,000 of its money Nichols had previously taken.  The note had been signed in blank by Welch and the sureties at Nichols's request during the previous July.  Lincoln R. Welch was not financially responsible to the extent of the note, and neither he nor either of the indorsers received any of the proceeds of it.

On October 13, 1925, the loans to McLearn and Welch were considered by the investment committee of the plaintiff.  In response to questions Nichols told the committee that the money loaned on the McLearn note " was to be used by McLearn in carrying to fulfillment his building program, to be used for the building of this house in this development."  He told the committee that the Welch loan would be repaid within a few days or satisfactory collateral furnished.  He said nothing to the effect that he himself got the proceeds of the two notes to pay off his own indebtedness.  The committee relied on his representations in approving the loans.

Nichols's acts were criminal under G. L. c. 168, § 29, and G. L. c. 266, § 53A, (added to the General Laws by St. 1922, c. 313, § 2).  G. L. c. 168, § 29, provides that " No . . . treasurer . . . [of a savings bank] shall borrow or use any portion [of its funds] . . . . "  G. L. c. 266, § 53A, provides that " An officer . . . [of a savings bank] who wilfully misapplies . . . any of the moneys . . . or who resorts to any fictitious or colorable loan, transfer or device to avoid any provision of law relating to such bank . . . . " shall be guilty of felony.  The facts warranted by the evidence would sustain the conclusion that the loans were made with fraud on the part of Nichols

as an officer of the bank, within the meaning of § 3e of the bond, *supra.*

The evidence would not warrant a finding that the plaintiff has exhausted every remedy it has against Nichols and the indorsers on the notes. It is, therefore, the contention of the defendant that the plaintiff has sustained no loss, or if it has, that it can recover nominal damages only.

A definition of the loss for which the defendant as surety is liable, as the net amount irrecoverable after all rights against others than the surety have been exhausted, clashes with several sections of the bond. Section 6 provides that " . . . the Underwriter upon payment of any loss hereunder shall become subrogated to all the rights and remedies of the Insured in respect of such loss." Section 9 provides: " At the earliest practicable moment, and at all events not later than ten days, after the Insured shall discover any loss hereunder, the Insured shall give the Underwriter notice thereof by registered letter or telegram . . . . Legal proceedings for recovery of loss hereunder shall not be brought . . . after the expiration of twelve months from the discovery of such loss. If any limitation embodied in this paragraph is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law." Under the provisions of the contract it is obvious that the definition of " loss " suggested by the defendant as the measure of its liability under its contract with the plaintiff might result in denying the insured a remedy altogether through its inability to exhaust its rights against third persons within the limitations of time allowed in the bond for bringing actions against the defendant. It is plain such a result unless absolutely required should not be held to express the intention of the parties. *American Surety Co.* v. *Pauly,* 170 U. S. 133, 144. In this bond the word " loss " means the deprivation or dispossession of money or property of the bank due to the dis-

honest, criminal or fraudulent acts of its officers, regardless of the security the bank has for the loss, and that the "loss" occurred and was suffered by the plaintiff, without regard to its possible remedies, when its funds in fact were diverted on October 8 and 10, 1925, through the fraud and dishonesty of its treasurer. *Forbes* v. *Manufacturers' Ins. Co.* 1 Gray, 371. *Queenan* v. *Palmer,* 117 Ill. 619, 629. *Mitchell Grain & Supply Co.* v. *Maryland Casualty Co.* 108 Kans. 379, 384. *First National Bank of Crandon* v. *United States Fidelity & Guaranty Co.* 150 Wis. 601, 607. *American Surety Co. of New York* v. *Lawrenceville Cement Co.* 96 Fed. Rep. 25, 30. *Champion Ice Manuf. & Cold Storage Co.* v. *American Bonding & Trust Co.* 115 Ky. 863, 874. It follows that the plaintiff could sue the defendant on its bond without proof that it had then sustained some actual defined loss, not merely nominal, as the result of the transaction in question. The evidence sustains the plaintiff's allegation that Nichols "did borrow and use" the plaintiff's money and "became directly or indirectly an obligor for money borrowed." The defendant cannot object to the plaintiff's failure to sustain the allegation that Nichols concealed his acts by giving the plaintiff "a fictitious, valueless, inadequate and irresponsible obligation" because the allegation was immaterial and the failure to prove such an allegation does not constitute a material variance. *Beatty* v. *Ammidon,* 260 Mass. 566, 574.

Section 9 of the bond requires the insured within ten days after the discovery of the loss to give the underwriter notice thereof by registered letter or telegram. Nichols resigned as treasurer of the plaintiff on November 9, 1925. There was evidence which would warrant the jury in finding that at that time the plaintiff knew he was heavily in debt but was not aware that it was involved in the management of his personal affairs; that on November 17, 1925, the plaintiff learned that Nichols was the person benefited by the loans of the plaintiff on the McLearn and Welch notes. On November 18, 1925,

the plaintiff wrote the defendant informing it of the two notes and stating that " . . . should the makers fail to pay them upon maturity, they would result in a loss to the Bank for which it would look to you on your Blanket Bond." The defendant contends that this letter was not a notice of loss within ten days from the tenth day of November, the day the loss was alleged in the declaration to have been discovered; that no telegram was sent or any registered letter until eighteen months later; and that the letter of November 10 in itself was not a notice of loss but, on the contrary, was a statement that no loss is expected.

The letters of November 10 and 18, 1925, were sufficient in form to give notice to the defendant that there was an apparent defalcation and to enable the defendant in its own time to make the necessary investigation to determine the merits of the claim. *McCord* v. *Masonic Casualty Co.* 201 Mass. 473. *McCarthy* v. *Rendle,* 230 Mass. 35. The defendant in reply to the letter of November 18 asked for further information — making no complaint of any defect in the notice sent nor raising the question of its validity as a notice because not registered or in the form of a telegram. In the circumstances it is evident the defendant should be estopped from setting up as a defence the defective form of the notice. Williston on Contracts, §§ 678, 679, 763. *Clark* v. *New England Mutual Fire Ins. Co.* 6 Cush. 342, 345. *Blake* v. *Exchange Mutual Ins. Co.* of *Philadelphia,* 12 Gray, 265, 271. *Cook* v. *North British & Mercantile Ins. Co.* 181 Mass. 101. *McCord* v. *Masonic Casualty Co.* 201 Mass. 473, 476. *Shapiro* v. *Security Ins. Co.* 256 Mass. 358, 365.

Section 9 of the bond requires the insured within three months after the discovery of the loss to " furnish to the Underwriter at its home office affirmative proof of loss with full particulars." The bond is silent as to whether the proof shall be written or oral. It is clear that this proof of loss could be given either in writing or orally

so long as it was furnished to the underwriter at its home office on or before February 17, 1926. *State Ins. Co.* v. *Maackens,* 38 N. J. Law, 564, 568. *Killips* v. *Putnam Fire Ins. Co.* 28 Wis. 472, 479, 480. To frame a categorical definition of the phrase " affirmative proof of loss with full particulars " is difficult if not impossible. In *O'Reilly* v. *Guardian Mutual Life Ins. Co of New York,* 60 N. Y. 169, a case where the court had before it a life insurance policy in which the notice and proof of the death were conditions precedent to recovery, it was said at pages 172, 173: " The notice and proof of death required as conditions precedent to a right of action upon the contract were distinct and separate acts . . . . A mere notice cannot supply the place of, or dispense with, the more formal proof provided for in the policy. The two are entirely distinct in their character, and are mentioned as two distinct acts to be performed by one who claims the benefit of the insurance . . . proof, as that term is used, means something more than the unverified declaration of the party in interest, whether formal or informal . . . . Else why require ' proof ' in addition to ' notice ' . . . ' Proof,' as in addition to notice, must mean evidence in some form, such form as is usual and customary in such cases, or as is recognized by law, and is calculated to convince or persuade the mind of the truth of the fact alleged . . . . Proof is frequently used as the synonym of ' evidence ' . . . and it was probably so used in this instance. The condition can only be performed by furnishing evidence in some form of the truth of the fact stated in the notice, and upon which the right of action depends. It need not be that full, clear and explicit proof, which would be required upon the trial of an issue upon the question, but it must be such reasonable evidence as the party can command at the time, to give assurance that the event has happened, upon which the liability of the insurers depends . . . . The purpose of the condition is that the insurer may be able intelligently to form some estimate of his rights and liabilities

before he is obliged to pay, and some proof must be exhibited." See also *Ward* v. *Maryland Casualty Co.* 71 N. H. 262, where it was held that, where a contract of insurance required the giving of " full particulars " of an accident as a condition precedent to liability, unnecessary details were not required but only such as would enable the defendant to determine whether a claim was likely to be made; and that the plaintiffs were not obliged to make an exhaustive investigation of all attendant circumstances or decide what the facts were upon conflicting evidence. *Silberstein* v. *Vellerman*, 241 Mass. 80, 85, 86. *Jenkins* v. *Hawkeye Commercial Men's Association*, 147 Iowa, 113, 119. See also *McCord* v. *Masonic Casualty Co.* 201 Mass. 473; *McCarthy* v. *Rendle*, 230 Mass. 35.

Within any definition of " full particulars " derivable from any decision which has been brought to our attention by either plaintiff or defendant we do not think the letters sent by the plaintiff to the defendant within three months from its discovery of the loss, which are respectively dated November 10, 1925, November 18, 1925, January 11, 1926, January 16, 1926, and February 1, 1926, would warrant the jury in finding that the plaintiff within the allotted period had submitted to the defendant " affirmative proof of loss with full particulars "; nor do we think the giving of the McLearn and Welch notes to the investigator, Sullivan, at his request, with the letters afforded sufficient evidence to warrant a jury in finding that such proof was furnished. There is nothing in these letters or in the interview with Sullivan to prove that a loss had been sustained by the plaintiff which was due to any dishonest or criminal act on the part of any of the officers of the plaintiff. The communications did not include all the information or particulars then within the knowledge of the plaintiff which were derivable from documents in its possession, or the facts relating to these transactions which were well known to its acting treasurer and were testified to by him at the trial or were from its register and cash book, or

material facts known to a member of its board of investment and shown at the trial. We think the evidence, documentary and oral, would not warrant a finding that the plaintiff furnished " affirmative proof of loss with full particulars," and that the case at bar is distinguishable from *Traiser* v. *Commercial Travellers' Eastern Accident Association,* 202 Mass. 292, and *Eaton* v. *Globe & Rutgers Fire Ins. Co.* 227 Mass. 354, upon which the plaintiff relies.

The plaintiff contends that even if the plaintiff did not comply with the requirements of the bond in furnishing " affirmative proof of loss with full particulars," such requirement and such proof were waived. We assume, without decision, that the conversation of January 14, 1926, with Sullivan, an investigator merely for the defendant, when Sullivan denied the liability of the defendant on the ground that not more than one officer of the bank was implicated in the transaction, was admissible as one of the circumstances which might be considered in drawing an inference of waiver. There is no evidence of an intentional waiver by the defendant. It follows that the defendant can be held to have waived the required proof of loss only on the theory that its conduct was such that it lulled the plaintiff into a feeling of security and that it was against good faith for it to object at the trial that the proof was not sufficient. *Shapiro* v. *Security Ins. Co., supra.* On January 22, 1926, the defendant, through its attorney, wrote the plaintiff's president ". . . You are, of course, in possession of all the facts surrounding this matter. As surety on this bond we are entitled to whatever information you have that in any way affects this bond. If you have a claim against it, it is our duty to consider it and we should be glad to do so. If you have no claim to make it seems to us that you should so advise us. Whatever the information, whatever the facts in your possession, it is your duty and the duty of the bank frankly and fully to furnish them to this Company."

It is the contention of the plaintiff that the conversation with Sullivan on January 14, and the Carney letter of January 15, 1926, constitute a denial of liability on

the merits and that such unqualified denial would justify the plaintiff in relying thereon and not furnishing further proof. *Clark* v. *New England Mutual Fire Ins. Co.* 6 Cush. 342. The plain request of the defendant on January 22, 1926, within the three months' period allowed for proof, however, prevented reliance on the conversation with Sullivan confirmed by the letter of Carney. There is no evidence of an express waiver of the condition precedent by the defendant after the three months' period had elapsed, or any evidence that after that period the plaintiff abandoned any right or changed its position to its prejudice in reliance upon any statement or conduct of the defendant or of its representatives. There is nothing in the letter of May 11, 1927, or in the letter of May 26, 1927, which discloses any intent to waive the performance of the condition precedent. The evidence of Sullivan which was excluded by the trial judge on the question of waiver has been considered, and its exclusion presents no reversible error.

The direction of the verdict for the defendant was right. In accordance with the terms of the stipulation, judgment is to be entered for the defendant on the verdict.

*So ordered.*