## PHŒNIX NAT. BANK & TRUST CO. OF LEXINGTON v. ÆTNA CASUALTY & SURETY CO.

### No. 5427.

Circuit Court of Appeals, Sixth Circuit.

Nov. 12, 1930.

B. D. Berry, of Lexington, Ky. (James Park, of Lexington, Ky., on the brief), for appellant.

C. M. Harbison, of Lexington, Ky. (Wilson & Harbison, of Lexington, Ky., on the brief), for appellee.

Before DENISON and HICKENLOOPER, Circuit Judges, and ANDERSON, District Judge.

DENISON, Circuit Judge.

The appellant bank, plaintiff below, was carrying a deposit for the Petroleum Company, doing business at Lexington. Fulton was treasurer of the depositor, and was the clerk in general charge of its business office, books, and records. It eventually developed that, over a considerable period, Fulton had been obtaining money from the bank upon his company's checks, by means of forging endorsements or raising checks, or both. During this period, the bank had been carrying the indemnity policy of the appellee, defendant below, which had been issued and continued in consideration of an annual premium, and by which the surety company agreed to indemnify the bank and hold it harmless "from and against any loss sustained by the insured * * * that is to say * * * D. Any loss through the payment, whether received over the counter or through the clearing house or by mail, of forged or raised checks or (genuine) checks bearing forged endorsements." From time to time the bank charged to the depositor's account all these payments, as made. Running over the period from May 12, 1924, to August 1, 1925, the bank paid and charged to the depositor 39 such invalid checks, in the total amount of $5.551. At the end of each month, the bank rendered to the depositor the customary monthly statement, in which each of these checks was shown as charged against the account, and returned to the depositor, as a voucher, each of the invalid checks.

These statements and canceled checks were delivered to Fulton, in the regular course of business, and never came to the notice or knowledge of the depositor in any other way. In August, 1925, Fulton disappeared, and, upon hasty search then made by the bank, some of these checks were discovered, and a complete investigation was undertaken. During September this was in progress and the surety company was advised. September 25, the depositor made formal demand upon the bank to cancel these 39 charges against its account and recredit it with the total sum which had been improperly charged. This demand was transmitted to the surety company, with the statement that the bank felt compelled to comply therewith, and with a request for indemnity. In reply, the surety company insisted that it was the duty of the bank to decline to make such recredit, and also to take steps against the responsible indorsers upon many of the checks. Nevertheless, the bank, after consideration, did recredit this sum, and then brought this suit against the surety company to recover the amount of the several checks, as being losses suffered under the policy. The parties, by written stipulation, waived a jury and filed an agreed statement of facts. This was treated as presenting one (and only one) issue of law—whether judgment should be for plaintiff or for defendant. The trial judge thought the plaintiff could not recover, filed an opinion giving his reasons therefor, and entered judgment accordingly.

The defenses were two: First, that the loss was suffered when the recredit was made, and that this act was voluntarily done by the bank, in the sense that the bank was not legally obligated to make this recredit, and could have successfully defended any proceeding alleging such liability. Second, that the bank had failed in its duty in taking the necessary steps to charge the endorsers before Fulton, and had thereby pro tanto discharged the surety. The District Court sustained the first defense and did not pass upon the second.

Appellant urges upon us that the case is controlled by our decision in Ocean Co. v. Old National Bank, 4 F.(2d) 753, and deduces from that opinion the proposition that upon such a policy the insured may recover, even though its assumption and payment of the loss had been voluntary. That opinion should not be so interpreted, in the broad sense necessary to reach this case. There, the payment had been voluntary only in the sense that it had not been compelled by judgment; the liability of the bank to its customer was held to have been clear and certain; the surety company's position was that the bank should have compelled an action to be brought against it and given the surety company an opportunity to defend, if defense there might have been; our holding was only that such a clearly apparent liability might be voluntarily recognized and paid by the bank without thereby discharging the surety. In the present case, the defendant's claim is that the bank was under no legal duty to make this recredit (which is said to be the loss involved) and so that the loss was suffered voluntarily, in the complete sense of that word. We think it plain that the consideration of that question here is not substantially affected by our decision in the Ocean Case.

The primary question is: When was the loss suffered? We conclude that the moment the bank paid the check over the counter or through the clearing house, its loss was complete. The relation between banker and depositor is that of debtor and creditor; the money with which the check is paid is the money of the bank; its contract with the depositor only entitles it to charge back to, and collect from, the depositor the amount of a valid check so paid. When it pays a forged check, it has no right to make this counter charge, and its loss continues to be its loss. True, the continuance is attended by a contingency—the depositor may ratify the forgery. Such a ratification may be intentional and express, or may be implied as the result of circumstances which estop the depositor from disputing the check. So, in the present case, the loss was suffered and the liability arose from time to time as the checks were paid; and, when finally the bank canceled the charges and recredited the total, it was not then suffering a loss; it was abandoning a claim for recoupment of its earlier loss—a claim which at first it did not have. We think, therefore, that the policy should be read as indemnity against the original loss, and not as holding the liability in the air until it can finally be determined whether the bank had a right to make the charge back. It is not reasonable to suppose that the bank intended to buy that kind of indemnity. Banks wish to keep their depositors, not to alienate them. They would desire protection against the payments induced by forgery, not against the uncollectability of claims resulting from such payment.

The question just discussed seems to be one of first impression; we are not cited to any particularly helpful precedents. Decid-

ing this question as we do, the appellee's argument that the policy does not insure against liability, but only against loss, become immaterial. For example, in American Surety Co. v. Ballman (C. C.) 104 F. 634, there was a bond to secure the performance of a contract and then a bond to the surety to secure it against loss. The loss matured and was suffered only when the amount was fixed by the suit on the first bond. In Thacher v. Ætna (C. C. A.) 287 F. 484, 28 A. L. R. 1280, the bond indemnified against damages from a tort. It was quite appropriate to think that the parties contemplated protection against damages to be fixed by suit.

The present record does not call upon us to decide what the rights of the parties would be in a case where the forgery had been expressly ratified before claim was made under the policy. Here the loss has been, as between the bank and the depositor, assumed by or clearly fixed upon the bank. We hold now only that the bank is not obliged to contest with the depositor any plausible claim by the latter that it has not become liable for the loss; and that, if there is any reasonable ground of litigation, the bank is not obliged to carry the burden of the resulting controversy. We find here that to the claim of the bank that the depositor was bound because of its failure to object to the monthly statements and returned checks, the depositor answers that it never had any notice of these checks excepting the notice thus given to its agent, Fulton; and that this was not notice to it, as principal, because the agent had a hostile personal interest in the subject matter. These respective claims present a controversy, held no doubt on each side in good faith, and capable of leading to tedious and expensive, if not doubtful litigation. It might turn out that such a case would be ruled by Leather, etc., Bank v. Morgan, 117 U. S. 96, 6 S. Ct. 657, 29 L. Ed. 811; conceivably, many facts which now appear or which might develop would distinguish therefrom. It would be most unfortunate for such an issue to be tried in a case to which the depositor was not a party, and where it would not be bound. Whether the surety company could have brought in the depositor as a party, or could now recover against it, we need not consider.

Many, perhaps all, of these checks had been cashed for Fulton by others, and when they were paid by the bank bore indorsements by responsible persons. These indorsers then and there became liable to the bank, if the necessary notice was given. It gave no notice at that time, not knowing of the forgery. After being fully informed, it still gave no notice; but on October 2 reported to the surety company that the depositor demanded this recredit and gave the surety company full particulars. On November 25, the surety company notified the bank that the latter should have given notice at once to all indorsers and should now do so; it again so insisted on February 4; but the bank made no effort to comply.

There is no doubt that prompt notice was necessary in order to shift the loss from the paying bank to the indorser; but that right to shift is one given by the law and is contingent on conditions—one of which is prompt notice. The shift here involved is given by contract and is unconditional. We have construed this contract, this insurance policy, as intended to transfer the whole loss immediately when suffered and not merely to indemnify against such part of the loss as might not be recoverable in some other way. Under such a construction, the failure of the bank to try to charge indorsers is a defense of the same character as its failure to resist the depositor's demand for recredit. We hold that neither defense is good.

If the surety company could get the benefit of any rights the bank had to recover its loss, or part of it, from others, it would be by paying the loss and acquiring these rights through subrogation. Travelers' Co. v. Great Lakes Co. (C. C. A. 6), 184 F. 426, 430, 36 L. R. A. (N. S.) 60; United States Fidelity Co. v. Union Bank (C. C. A. 6), 228 F. 448, 452. The surety company was doubtless entitled itself to give the necessary notices. Its request to the bank to do so was not in connection with any offer to pay up its liability, so that it might be entitled to have them given for it; the request was in connection with a denial of all liability.

The judgment must be reversed, and the case remanded for the entry of judgment for plaintiff in accordance with this opinion.